# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 5, 2014

## STATE OF TENNESSEE v. DANNY R. MAYS

**Direct Appeal from the Circuit Court for Madison County**
**No. 11511        Donald H. Allen, Judge**

---

**No. W2013-01052-CCA-R3-CD  -  Filed April 24, 2014**

---

A Madison County jury convicted the Defendant, Danny R. Mays, of felony evading arrest, reckless driving, driving on a cancelled, suspended or revoked license, leaving the scene of an accident, violation of the registration law, criminal trespass, vandalism, and possession of marijuana. The trial court sentenced the Defendant to an effective sentence of eight years. On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions for felony evading arrest, reckless driving, driving on a cancelled, suspended or revoked license, and possession of marijuana. After a thorough review of the record and the applicable authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Gregory D. Gookin, Assistant Public Defender, Jackson, Tennessee, for the Appellant, Danny R. Mays.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin E.D. Smith, Assistant Attorney General; James G. Woodall, District Attorney General; Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

This case arises from a traffic stop of a vehicle driven by the Defendant that occurred on November 23, 2010, at 8:25 a.m. As a result of events that occurred after the stop, a Madison County grand jury indicted the Defendant for felony evading arrest, reckless

driving, driving on a cancelled, suspended or revoked license, leaving the scene of an accident, violation of the registration law, criminal trespass, vandalism, and possession of marijuana. At the Defendant's trial on these charges, the parties presented the following evidence: Joseph Williams, an officer with the Jackson Police Department, testified that he was part of the "street crimes unit" and, as such, he was typically dressed in uniform and in a marked patrol car when he was on duty. He said that on November 23, 2010, at approximately 8:25 a.m., he saw a white Chevrolet Caprice, 1991 or 1992 model, with a vehicle tag number 380 XXL. He put the tag number into his patrol unit's computer to check the tag through "NCIC." The tag returned as being registered to a 2002 Saturn. Based upon this information, Officer Williams initiated a traffic stop.

Officer Williams testified that, after he activated his lights, the vehicle's driver did not immediately pull over and stop, continuing southbound. Officer Williams said that the driver did not increase his speed but failed to pull over. Officer Williams activated his sirens and, as the two vehicles approached an intersection, the driver increased his speed "highly" to approximately fifty miles per hour and ran the stop sign at the intersection. The driver then slightly slowed down at a red light and turned right, which was westbound. Officer Williams testified that the driver did not stop and did not have time to check for oncoming cars.

Officer Williams testified that he continued to pursue the driver, whose speed reached greater than seventy miles per hour. The officer, who was on the police radio with his supervisor, relayed the events as they were occurring to his supervisor. His supervisor advised him, because of the speed and the traffic, to "disengage the pursuit." Officer Williams complied with the order immediately. Officer Williams explained that disengaging meant that he turned off his lights and siren and reduced his speed, following all traffic laws. He said that, as he disengaged, the vehicles were approaching the Highway 45 bypass. There was a red light at the intersection, and the driver of the vehicle, traveling at a high rate of speed, continued through the intersection, nearly striking a vehicle turning northbound head-on. When avoiding the head-on collision, the driver nearly lost control of the vehicle but was able to regain control. The officer followed the driver, driving a normal rate of speed and without his lights and sirens activated, until the driver sped out of his view. He estimated that the driver was traveling at 100 miles per hour when he lost sight of him.

Officer Williams said that, a short time after he lost sight of the driver and was returning to his normal duties, he received a radio call from his supervisor advising him that the Sheriff's Department had encountered the same vehicle. Officer Williams was directed to provide the state troopers the "county" and the tag number. Officer Williams was still in the area and saw the vehicle traveling at a high rate of speed back "into town." The driver was speeding toward the officer at around sixty to seventy miles per hour. Officer Williams pulled over to the side of the road and, after the driver passed, he made a U-turn and

2

reinitiated pursuit with his lights and sirens activated.

Officer Williams testified that, during the pursuit, the traffic was "heavy." The driver went through several intersections and then began driving southbound in the northbound lane. The officer observed "cars going in every direction attempting to avoid this vehicle from being struck head-on by this vehicle at a high rate of speed." Vehicles were moving left and right, getting into the median and emergency lane to avoid a collision. Officer Williams saw one vehicle drive into a ditch between the two lanes and spin around two or three times in an attempt to avoid being struck head-on.

Officer Williams said that he pursued the vehicle toward downtown and that he followed the vehicle as it traveled into the appropriate lane of travel. At this point, two sheriff's deputies joined in the pursuit. Officer Williams said he maintained contact with dispatch to inform them of his path of travel. Sergeant Whitman, who was in the downtown area, was attempting to discern the lane of travel of the vehicles so that he could set out spikes in an attempt to deflate the tires of the driver's vehicle. Officer Williams received information from Sergeant Whitman that the driver's vehicle had collided with his patrol car, and Sergeant Whitman was joining the pursuit. Officer Williams said that Sergeant Whitman was the lead vehicle at this point and that Officer Williams was the third or fourth car in pursuit.

Officer Williams recalled that Sergeant Whitman radioed that the driver had exited his vehicle and was fleeing on foot. The officer arrived at the scene and saw the driver's vehicle with the door open, off the side of the road up on on a little hill where it had rolled off the road. Officer Williams drove past the vehicle and on to another street in an attempt to cut off the driver. Sergeant Whitman then radioed and advised him that the had last seen the driver at 210 McCowat Street. Officer Williams traveled the short distance to that address, which appeared to be a single family residence, and he immediately set up a perimeter. The officer noted that there was broken glass on the rear door of the address, and he advised the other officers engaged in the pursuit. Officer Whitman secured the back door, and Officer Williams went to the front of the house, where he observed other officers speaking with someone who had answered their knock. Officer Williams returned to the back door, and he and Officer Whitman looked inside the back door. They saw the driver attempting to conceal himself by lying down between a number of items that were in the room.

Officer Williams said that he gave the driver commands to "stand up," and the driver ignored those commands, continuing to lie on the floor. The officers entered the room and forcibly took the driver into custody. The officer then identified the Defendant as the driver of the vehicle that he pursued on that occasion. Officer Williams recalled that the

3

Defendant's arms and hands were bleeding. Officer Williams transported the Defendant to the officer's patrol car, where he obtained the Defendant's Tennessee State Identification card, which listed the Defendant's name and date of birth.

Officer Williams testified that he put the Defendant's information into his computer and determined that the Defendant's driver's license had been revoked. The State offered a certified copy of the Defendant's driving history, which confirmed that his driver's license had been revoked at the time of his arrest. The officer also determined that the license tag on the Defendant's vehicle was registered to a different vehicle that was owned by a different person.

During cross-examination, Officer Williams testified that he did not search the vehicle after the Defendant fled. He conceded that there could have been someone else in the vehicle who could have ducked behind the seat as he was pursuing the Defendant. He did not, however, believe this to be the case. The officer said that Sergeant Whitman was the first person on the scene where the vehicle was located because he was the officer pursuing the vehicle at that time. Officer Williams denied recalling that he had testified differently in any other proceedings. Officer Williams said he did not personally observe the Defendant exit the vehicle. Further, he said that, during the pursuit, he was only able to identify the Defendant as an "African-American male" and was unable to observe anything else about him until he saw the Defendant in the residence at 210 McCowat Street.

Officer Williams testified that the vehicle was later secured and photographed, and officers determined by the vehicle identification number that the vehicle was not stolen. They conducted no further investigation into the owner of the Saturn to which the vehicle's license plates belong. The officer conceded that his testimony that the driver exceeded speeds of one hundred miles per hour was based upon his personal estimation. Officer Williams agreed that, once the Defendant was arrested, police ceased searching for any other suspects. During redirect examination, Officer Williams identified photographs of the vehicle at the scene where it was abandoned, and he noted that only the driver's side front door was open. The officer testified that Officer Arnold with the Jackson Police Department took these photographs. During re-cross-examination, Officer Williams conceded that he did not know how long after the Defendant was apprehended that the photographs were taken.

Jefferey Tullos, a Sergeant with the Madison County Sheriff's office, testified that, on November 23, 2010, he was traveling away from downtown Jackson when he noticed a "city unit," with its lights and sirens activated, following a white Chevrolet Caprice. The vehicle was approaching an intersection, with the police car following closely behind, and then turned and headed toward the "bypass." Sergeant Tullos joined the pursuit. Shortly after that, the city police officer disengaged the pursuit, and the Caprice proceeded west.

4

When the city police officer stopped pursuit, Sergeant Tullos also ended his pursuit of the vehicle. Sergeant Tullos testified that the vehicle was traveling in excess of the speed limit, but he could not estimate the vehicle's speed.

Sergeant Tullos testified that he next saw the vehicle stopped in traffic. The vehicle, which had only one occupant, proceeded through the intersection against the light headed toward downtown. The Sergeant activated his lights and sirens and again began to pursue the vehicle. The vehicle then entered the northbound lane, traveling south against the flow of traffic. Sergeant Tullos observed several vehicles swerving out of the path of the vehicle, one of which proceeded into the median. Sergeant Tullos slowed down his rate of speed to ensure there were no major accidents and that no one was injured. The Sergeant said he lost sight of the vehicle, which was still being pursued by other officers.

Sergeant Tullos said that the next time he saw the vehicle it was stopped, and the occupant of the vehicle had exited. The sergeant followed some of the city officers toward McCowat Street and there met Sergeant Whitman, who stated he had found a broken window at the back door of 210 McCowat Street. The Sergeant testified that he assisted in apprehending the Defendant, who was lying on the floor under some debris in the utility room at the rear of the house.

During cross-examination, Sergeant Tullos testified that he was, at one point, only one car length from the vehicle during the pursuit. The sergeant agreed that no cars were damaged when the vehicle traveled south in the northbound lane. Sergeant Tullos agreed that he did not see the Defendant exit his vehicle. During redirect examination, Sergeant Tullos testified that the Defendant appeared similar to the person that he saw driving the Caprice.

Phillip Whitman, a sergeant with the Jackson Police Department, testified that he became aware of this pursuit by radio, and he learned that the pursuit was headed his direction. He then observed a white "Chevy" being pursued by a deputy. Sergeant Whitman testified that he decided to attempt to terminate the pursuit, but he "missed [his] opportunity." He explained that, as the vehicle approached, he attempted to hit the vehicle with his patrol car. The sergeant hit the vehicle in the left quarter panel between the rear tire and the trunk area, resulting in only a glancing blow. The vehicle "fishtailed" and continued on.

Sergeant Whitman testified that he joined the pursuit, which was headed through the downtown area of Jackson. Sergeant Whitman noted that the driver "blew through every intersection it came to." After pursuing for a short distance, Sergeant Whitman observed the driver of the vehicle jump out of the vehicle, leaving it in gear. As the vehicle ran into a light pole, Sergeant Whitman observed the driver, noting he was an African American male wearing black jeans, a white t-shirt, a black hooded jacket, and white tennis shoes with green

soles. In his car, Sergeant Williams followed the fleeing driver through an alley. When he saw Officer Williams, who indicated that he had not yet seen the driver, Sergeant Whitman believed the driver was located in the area of the two houses between the alley and the street.

Sergeant Whitman testified that he and Officer Williams made a "sweep" of the area, and they noted broken glass on an exterior door of a home. It appeared that someone had broken the glass, and then reached around and unlocked the door. Sergeant Whitman said that, when he looked inside the residence, he saw the Defendant, wearing the white tennis shoes with green soles, lying on the floor. Officers took the Defendant into custody, and Sergeant Whitman noted that the Defendant was no longer wearing a black hoodie jacket. The sergeant said that other officers located the jacket near a fence close to the scene.

During cross-examination, Sergeant Whitman testified that he was unsure whether anyone took fingerprints or DNA samples from the vehicle. The sergeant said that he did not participate any further in investigating this case.

Phillip Kemper, a sergeant with the Jackson Police Department, testified that he was working on November 23, 2010, when he heard that there was a police pursuit that involved the Jackson Police Department and the Madison County Sheriff's Department. Sergeant Kemper was not involved in the pursuit, but he responded later to the McCowat Street address. When he arrived, the other officers had isolated the house that they believed the driver had entered. There was a K-9 officer present, and the dog was trying to track the path the driver had taken. Sergeant Kemper went into the backyard of the residence where a black jacket was found. Inside the jacket, Sergeant Keper found a "Swisher Sweet's [cigar] box." He opened the box and found it contained a marijuana "joint." The sergeant notified the patrol officer who was taking the pictures and collecting evidence, and the officer came and photographed and collected the jacket and the box.

During cross-examination, Sergeant Kemper testified that he looked around the fence in the area where the jacket was found. He could not recall if there was a hole in the fence, but he said that the fence did not appear to be damaged. The sergeant agreed he picked up the jacket before it was photographed, but he said he did not transport the jacket anywhere and instead only checked the pockets.

Edward McMullen, an officer with the Jackson Police Department, testified that he was working on November 23, 2010, when he was made aware of the pursuit of the white Chevrolet Caprice in this case. He said that he was not involved in the pursuit but that he headed in the general direction to offer assistance. When the pursuit ended, and the driver fled on foot, Officer McMullen assisted in establishing a perimeter around the area where the driver was thought to have fled. Officer McMullen said that he went to the house where

6

Sergeant Whitman was located in the backyard. Sergeant Whitman indicated that Officer McMullen should go to the front of the house. An African-American man came to the front door. Officer McMullen spoke with the man, who said that he and his mother lived there. Officer McMullen talked to the two residents, informing them about the investigation.

Officer McMullen testified that he then went around to the back of the home to tell Sergeant Whitman that there was a man and a woman in the house. Sergeant Whitman silently motioned to Officer McMullen that he had seen the suspect and told him to ask the residents if there was broken glass on their back door. Officer McMullen returned to the front of the home, asked the residents about the door, and was informed that there should not be any broken glass. Officer McMullen then instructed the two residents to exit the house for their own safety. Officer McMullen and a deputy entered the front of the home and heard other officers taking someone into custody. Officer McMullen explained he heard the officers yelling, "Let me see your hands." By the time Officer McMullen was able to walk downstairs to the back of the home, the Defendant was in custody.

Officer McMullen testified that his only other involvement in this case was to take photographs of the damage to the house where the Defendant was found hiding and a jacket located near the house. Officer McMullen also photographed a marijuana cigar that Sergeant Kemp had found in the jacket pocket.

During cross-examination, Officer McMullen testified that he did not recall Officer Kemper saying that he had moved the jacket before Officer McMullen photographed it. He said that he did not personally recall that the Defendant was wearing green-soled tennis shoes, but he recalled this fact being discussed on the police radio. Officer McMullen recalled that the two residents of the house informed him that there was no one else present in the home. He said that they were "rattled" when he informed them that someone had entered their home from the back porch.

Betty Puryears, a resident of 210 McCowat Street, testified that police officers came to her home on November 23, 2010, while she and her son, who lived with her, were at home. She recalled that, before officers entered her residence, she and her son were watching them from her window. She said that there were police "cars everywhere" and officers running up and down the street. An officer came to her door and asked who lived in the home. She told the officer that she and her son, who was standing with her, were the only two people who lived there. Ms. Puryears testified that she did not know that there was someone in their home. Officers brought the man to the living room, and Ms. Puryears identified the Defendant as the man who had been in her home that day. She said she did not know the Defendant, and she had not given him permission to be in her house that day.

7

Ms. Puryears testified that, as a result of this incident, the glass in her back door was broken, and her washing machine, which was located in the utility room, was also broken. Her landlord repaired the glass in the door, but she was required to replace her washing machine, which cost her approximately $390.

During cross-examination, Ms. Puryears testified that she did not know how much time elapsed between the time the Defendant entered her home and when he was apprehended by police. Ms. Puryears said that there was a fence in part of her backyard and that she did not recall it having any holes in it.

Brenda McNeil, an evidence technician for the Jackson Madison County Metro Narcotics Unit, testified that she received the drug evidence in this case. She took this evidence to the Memphis Tennessee Bureau of Investigation crime laboratory for testing. After it was tested, she transported the evidence back to her facility.

Shalandus Harris, a Special Agent Forensic("TBI") Scientist with the TBI, testified that the evidence submitted to her was a hand-rolled cigar. Agent Harris tested the material inside the cigar and determined it was marijuana. During cross-examination, she agreed she did not weigh the marijuana, and she could not testify about how much marijuana the cigar contained.

The State entered a certified copy of the vehicle registration of license plate 380 XXL.

The Defendant recalled Sergeant Williams, who reiterated that Sergeant Whitman was the lead vehicle in the pursuit at the time the driver fled from the white Caprice. Sergeant Whitman was, therefore, the one who saw the driver leave his vehicle. Sergeant Williams said he did not recall being asked that question previously at a different hearing.

Based upon this evidence, the jury convicted the Defendant of felony evading arrest, reckless driving, driving on a cancelled, suspended or revoked license, leaving the scene of an accident, violation of the registration law, criminal trespass, vandalism, and possession of marijuana. The trial court sentenced him to an effective sentence of eight years. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions for felony evading arrest, reckless driving, driving on a cancelled, suspended or revoked license, and possession of marijuana. He argues in his brief that the proof was insufficient to prove his identity. He asserts that officers could only say that the Defendant

had "similar" physical characteristics to the suspect that they were pursuing. Sergeant Whitman said he saw a black male wearing clothing similar to that which the Defendant was wearing, but the Defendant points out that, when he was apprehended, he was not wearing a black jacket. Further, he notes, Sergeant Whitman never saw him discard the jacket. The State counters that ample evidence supports the Defendant's convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given

9

> to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant attacks the sufficiency of the evidence against him based solely upon the fact that the State, he asserts, did not sufficiently prove his identity. The identity of a perpetrator is an essential element of any crime. *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). Issues regarding identity, however, are questions of fact to be determined by the jury. *State v. Vaughn*, 29 S.W.3d 33, 40 (Tenn. Crim. App. 1998).

After our review of the record, we conclude that the evidence is sufficient to sustain the Defendant's convictions because the State proved his identity. Sergeant Williams began his pursuit of a white Caprice that had vehicle tags not matching the vehicle description. He noted that the driver was an African-American male. After the pursuit was ceased and then restarted, Sergeant Whitman became the lead officer in pursuit of the Caprice. At the conclusion of the vehicle pursuit, the driver of the vehicle fled on foot. Sergeant Whitman, who was a car length from the vehicle at this point, saw that the driver was wearing green-soled tennis shoes, a white t-shirt, and a black hoodie sweatshirt. The sergeant pursued the driver in his patrol car, while the driver was on foot. The sergeant only briefly lost sight of the driver, and he determined that the driver must have fled to one of two houses, one of which was 210 McCowat Street. In the back of that residence, Sergeant Whitman noted that a glass door had been broken. When he looked inside the room to which the door led, he saw a man laying on the ground who was wearing green-soled tennis shoes and a white t-shirt. Sergeant Whitman took the man, who had blood on his arms, into custody, and his identification showed that he was the Defendant. Nearby, officers found a black hooded jacket, and Sergeant Whitman identified the jacket as being similar to the one worn by the Defendant as he fled. In the jacket, officers found a marijuana cigar. This evidence sufficiently proves the Defendant's identity as the perpetrator of these offenses and his possession of the marijuana. He is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE